# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ruben Castillo | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 3316 | **DATE** | 6/12/2003 |
| **CASE TITLE** | Nicholas Stavros vs. Exelon Corporation, et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due _____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendants' motion to dismiss plaintiffs' consolidated amended class action complaint [17-1] is granted. This case is hereby dismissed with prejudice. Judgment is entered in favor of the defendants and against the plaintiffs.

(11) ■ [For further detail see order attached to the original minute order.]

| | |
|---|---|
| | No notices required, advised in open court. |
| | No notices required. |
| | Notices mailed by judge's staff. |
| | Notified counsel by telephone. |
| ✓ | Docketing to mail notices. |
| ✓ | Mail AO 450 form. |
| | Copy to judge/magistrate judge. |

number of notices

JUN 13 2003
date docketed

docketing deputy initials

date mailed notice

RO — courtroom deputy's initials

U.S. DISTRICT COURT
CLERK
03 JUN 12 PM 2: 24
FILED-ED 10
date received in central Clerk's Office

mailing deputy initials

Document Number

32

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| NICHOLAS STAVROS, on behalf of himself and all others similarly situated, | ) ) ) |
| Plaintiffs, | ) ) ) No. 02 C 3316 |
| v. | ) ) Judge Ruben Castillo |
| EXELON CORPORATION, CORBIN A. MCNEILL, JR., JOHN W. ROWE, RUTH ANN GILLIS, | ) ) ) ) |
| Defendants. | ) ) |

**DOCKETED**
JUN 1 3 2003

## MEMORANDUM OPINION AND ORDER

Plaintiff Nicholas Stavros filed this securities class action lawsuit against Defendants Exelon Corporation ("Exelon"), Corbin A. McNeill, Jr. ("McNeill"), John W. Rowe ("Rowe") and Ruth Ann Gillis ("Gillis") (collectively "Defendants"), claiming violations of § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Securities Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5, as well as violations of § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), against McNeill, Rowe and Gillis ("Individual Defendants").[1] Defendants now move to dismiss Plaintiffs' consolidated amended class action complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) and for failure to plead securities fraud with particularity under Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). For the reasons set out herein, the Court grants Defendants' motion to dismiss. (R. 17-1.)

---

[1] On July 31, 2002, the Court consolidated several actions and appointed Natcan Investment Management, Inc. and the International Brotherhood of Electrical Workers Local 98 Pension Fund as lead plaintiffs ("Plaintiffs"). (R. 12, July 31, 2002 Order.)

# RELEVANT FACTS

## I. The Parties

The putative class includes all persons who purchased Exelon common stock between April 24, 2001, when Exelon issued a press release announcing its first quarter results and that it was on track to meet its target earnings per share ("EPS") of $4.50, and September 27, 2001, when Exelon issued a press release announcing a disappointing third quarter and revising its EPS target downward to $4.30-$4.45.

Defendant Exelon, the parent company of PECO Energy Company ("PECO") and Commonwealth Edison Company ("ComEd"), is headquartered in Chicago, Illinois and was formed by the October 2000 merger of PECO and ComEd's holding company, Unicom. In January 2001, Exelon restructured its merged operations into three segments: (1) Energy Delivery, the traditional regulated retail electricity distribution business of ComEd and PECO; (2) Generation, the electric generating facilities and Power Team, Generation's wholesale power marketing business; and (3) Enterprises, a collection of non-regulated businesses weighted toward the telecommunications industry.

During the class period, Defendants McNeill, Rowe and Gillis held high-level positions with Exelon. McNeill served as President of Generation and as Co-Chief Executive Officer ("Co-CEO") and Chairman of the Board of Directors of Exelon. Rowe was President and Co-CEO of Exelon and also had ultimate responsibility over Enterprises. Gillis served as Senior Vice President and Chief Financial Officer ("CFO") of Exelon.

## II. The Claims

Plaintiffs' § 10(b) and Rule 10b-5 allegations against Defendants stem primarily from two bases: (1) misrepresentations regarding Exelon's ability to meet its 2001 EPS projection of $4.50; and (2) violations of Generally Accepted Accounting Principles ("GAAP"). The factual allegations underlying these claims are set forth below.

### A. 2001 EPS Projections

Exelon's EPS projection of $4.50 initially was announced at a November 15, 2000 investor conference in New York. Using slides, which were filed with the SEC that same day as exhibits to a Form 8-K, Individual Defendants and then-CEO of Enterprises Michael Egan discussed Exelon's integrated strategy involving its three business segments. Defendants portrayed Energy Delivery as a "significant and steady source of earnings," Generation as the "primary growth vehicle in the near-term," and Enterprises as "position[ed] to provide longer term growth prospects." (R. 18-1, Defs.' Exs., Vol 1, Ex. B, Nov. 15, 2000 8-K.) Enterprises was projected to report a loss of $15 million in 2001 with earnings before interest and taxes ("EBIT") of $60 million, approximately 1.7% of Exelon's total projected EBIT. Exelon elaborated on its current and future performance in subsequent filings with the SEC, including a March 2001 Form 8-K that detailed the risks that could affect the company's results. *See infra* discussion of March 2001 Form 8-K.

Plaintiffs allege that Defendants made several materially false and misleading statements during the class period regarding Exelon's ability to meet its 2001 EPS target. The statements can be grouped into four categories: (1) statements announcing Exelon's first quarter 2001 results, (R. 14, Am. Compl. ¶¶ 63-68); (2) statements made during the second quarter 2001, (*id.*

3

at ¶¶ 69-73); (3) statements announcing the second quarter 2001 results, (*id.* at ¶¶ 74-80); and (4) statements made during the third quarter, (*id.* at ¶¶ 81-82).

## 1. Statements Announcing First Quarter 2001 Results

On April 24, 2001, the first day of the class period, Exelon issued a press release announcing its results for the first quarter of 2001. The press release was also filed with the SEC in a Form 8-K that same day. Exelon reported a "strong first full quarter since the completion of its merger" with earnings of $1.23 per share. (R. 18-1, Defs.' Exs., Vol 1, Ex. E, Apr. 24, 2001 8-K.) McNeill stated that Exelon was "clearly on track to meet [its] 2001 earnings target of $4.50 per share." (*Id.*) The press release also noted that Exelon's EBIT were $941 million, three-fourth's of which were contributed by Energy Delivery with the balance contributed by Generation, offset by a loss in Enterprises. Regarding the performance of Enterprises, the apparent focus of this suit,[2] the press release stated that "Enterprises' operations were negatively impacted by higher gas prices at Exelon Energy" but that "Enterprise companies performed in accordance with their business plans." (*Id.*) The release also identified matters discussed therein as forward-looking and contained cautionary information.[3] Soon after the issuance of the press

---

[2] Plaintiffs devote numerous paragraphs in their complaint to detailing "Enterprises' poor financial results and overvalued investments" that were allegedly unknown to investors. (R. 14, Am. Compl. ¶¶ 44-62.) In summary, by April 2001, the beginning of the class period, Defendants, Plaintiffs allege, knew or recklessly disregarded that Enterprises' businesses had been adversely impacted by the decline of the telecommunications market.

[3] The cautionary language stated in pertinent part: "Except for the reported historical information, matters discussed in this release are forward-looking statements that are subject to risks and uncertainties. The factors that could cause actual results to differ materially include future events affecting the demand for, and the supply of, energy, including weather and economic conditions and the availability of generating units, and other factors discussed in Exelon's filings with the SEC." (R. 18-1, Defs.' Exs., Vol. 1, Ex. E, Apr. 24, 2001 8-K.)

release, on May 2, 2001, a credit ratings agency upgraded Exelon's credit rating. On May 8, 2001, Exelon issued $500 million in senior unsecured notes; Generation also issued $700 million in senior unsecured notes on June 14, 2001.

Plaintiffs further allege that Exelon made materially false and misleading statements regarding its first quarter 2001 earnings in its Form 10-Q filed with the SEC on May 15, 2001. The Form 10-Q reflected EBIT of $293 million for Generation resulting from "higher margins on market and affiliate wholesale energy sales, coupled with decreased operating costs at the nuclear plants." (*Id.*, Ex. G, First Quarter 2001 10-Q.) Enterprises recorded negative EBIT of $31 million. The Form 10-Q also contained some cautionary language and incorporated by reference risk factors discussed in other SEC filings.

Plaintiffs allege that statements discussing first quarter 2001 earnings were false and misleading, allege Plaintiffs, because of declining wholesale energy prices and problems at Enterprises. Therefore, Plaintiffs contend that Defendants' statements reaffirming the EPS target of $4.50 per share lacked any reasonable basis.

### 2. Statements During the Second Quarter 2001

In a May 31, 2001 interview to the Wall Street Transcript Corporation, Rowe repeated Exelon's earnings commitment of $4.50 per share and stated that the company believed it had "a strong capability of meeting [its commitments]" and that it was working hard "not only to meet them but to beat them." (R. 14, Am. Compl. ¶ 69.) Regarding an economic slowdown, Rowe emphasized that all utilities are affected by a slowdown, but that Exelon was less affected than most because of its relatively low-cost generation base; nevertheless, Exelon would keep a "close weather eye on the economy." (*Id.*) Rowe also emphasized that Exelon had a very good first

quarter in spite of the shaky economic conditions and that the company was optimistic about having a good year even in an uncertain economy.

Rowe also represented that Exelon was on track to meet or beat its 2001 EPS target at a June 13, 2001 conference; his statements were included in a press release filed as a Form 8-K. (R. 18-1, Defs.' Exs., Vol 1, Ex. M, June 13, 2001 8-K.) Rowe attributed the company's success to better-than-anticipated value-creating opportunities in the first quarter, fueled by high gas prices and Power Team's increasing market savvy. When asked about the effects of an excess supply of generation on earnings and profitability, Rowe cited the "the resilience of an earnings protection afforded by Exelon's low cost nuclear production (less than 2.2 cents/kilowatt-hour), the expertise and market reach of Power Team and the heavy demand generated from ComEd and PECO's combined customer base of 5 million." (*Id.*) Rowe continued to describe Generation as Exelon's "near-term growth vehicle" and Enterprises as a "platform for future growth," recognizing that a downturn in the telecommunications market was impacting EIS[4] profit margins. (*Id.*) The June 13, 2001 Form 8-K identified some of the matters discussed therein as forward-looking statements that could be affected by the following factors: "future events affecting the demand for, and the supply of, energy, including weather and economic conditions and the availability of generating units, and economic, business, competitive and regulatory and other factors discussed in Exelon's other filings with the Securities and Exchange Commission." (*Id.*)

Rowe's statements during the second quarter were materially false and misleading,

---

[4] Exelon Infrastructure Services (EIS), a segment of Enterprises, provided infrastructure services to energy and telecommunications businesses.

6

Plaintiffs allege, because of a number of factors, including unfavorable weather, declining

wholesale energy prices, the economic slump, the decline of the telecommunications market, and

Exelon's failure to write down to market value its investment in telecommunications company

Corvis.

### 3. Statements Announcing Second Quarter 2001 Results

On July 24, 2001, Exelon issued a press release reaffirming its EPS target; the release

also was filed as a Form 8-K with the SEC. (*Id.* at Ex. I, July 24, 2001 8-K.) It listed a strong

performance by Power Team as a highlight, while noting that Power Team's success was

partially offset by cool weather throughout the nation. Individual Defendants each made

statements in the release regarding Exelon's performance and ability to meet its commitments.

McNeill noted that "[d]espite cool weather and the fall in wholesale prices in June, we've

produced earnings that surpassed market expectations." (*Id.*) Rowe acknowledged "larger

challenges in the wholesale power markets and in [the] Enterprise group during the second half,"

but opined that the "combined strength of [the] generation, power marketing and energy delivery

groups put [Exelon] in a strong position to meet [its] commitments for the year." (*Id.*) Gillis

also confirmed Exelon's EPS target, stating, "We have had two good quarters and we continue to

believe our integrated strategy positions us to meet our commitment of $4.50 earnings per share

for 2001." (*Id.*) Regarding Enterprises, the release noted Enterprises' loss of $5 million in the

second quarter; the loss "reflect[ed] lower margins in the infrastructure services business, which

[was] impacted by the significant downturn in the telecommunications industry." (*Id.*) The

release contained general cautionary language similar to that in prior releases: "factors that could

cause actual results to differ materially include future events affecting the demand for, and the

supply of, energy, including weather and economic conditions and the availability of generating units, and other factors discussed in Exelon's filings with the SEC." (*Id.*)

That same day Rowe appeared on CNBC's Business Center to discuss Exelon's second quarter results. Rowe noted that Exelon's diversification—in particular its "fine generation business" and distribution businesses—gave the company a partial hedge against swings in the market. (R. 14, Am. Compl. ¶ 76.) He noted that Exelon received "support from [its] major sectors" and expected to continue to work on that in the second half of 2001. (*Id.*)

On August 14, 2001, a few weeks after the July press release, Exelon filed its second quarter 10-Q with the SEC. Exelon reported EBIT of $126 million for Generation's second quarter, down from $293 million in the first quarter of 2001. Enterprises reported EBIT of negative $36 million, which reflected "lower margins in the infrastructure business associated with the significant downturn in the telecommunication industry, partially offset by additional margins associated with infrastructure services acquisitions." (R. 18-1, Defs.' Exs., Vol 1, Ex. J, Second Quarter 10-Q at 38.) Exelon also reported a $31 million decrease in revenues at EIS due to the downturn in the telecommunications industry. The 10-Q warned that factors discussed in SEC filings, some incorporated by reference, could affect results.

Plaintiffs contend that there was no reasonable basis for Defendants' continued assurances in the July 24, 2001 press release and the second quarter Form 10-Q that Exelon would meet its 2001 EPS target. In particular, Plaintiffs allege that Exelon was not hedged to withstand the known adverse conditions that negatively impacted Exelon's business and financial results, such as lower demand that left Exelon holding excess capacity purchased at higher prices earlier in 2001, low wholesale energy prices and a decline in telecommunications investments.

8

### 4. Statements Made During Third Quarter 2001

On September 27, 2001, Exelon, citing "reduced expectations for the third quarter and the recent economic uncertainty," issued a press release reducing its 2001 earnings guidance to a range of $4.30 to $4.45. (*Id.*, Ex. K, Sept. 27, 2001 8-K.) In particular, Exelon noted that weather-driven reductions in energy-market prices and volatility adversely affected Power Team's performance, Generation's litigation reserves increased by $14 million and severance charges increased to $30 million for the third quarter. Exelon also noted that Enterprises had experienced weakness in a number of its businesses in 2001 because of the downturn in the telecommunications market, and specifically mentioned an anticipated $36 million write down of its investment in Corvis and decreasing margins at EIS. Following the press release, the price of Exelon's common stock fell to $38.85 on September 27, 2001, from $50.45 on the previous day.

Exelon subsequently announced its third quarter results in late October 2001, reiterating its revised EPS target of $4.30 to $4.45; a third quarter Form 10-Q followed in mid-November. During a mid-October 2001 conference call, Rowe recognized that Enterprises had been "severely impacted over the past nine months," would "continue to be impacted by the collapse of the telecommunications market" and that Exelon ceased looking at Enterprises as a strategic growth engine. (R. 14, Am. Compl. ¶ 88.)

On January 29, 2002, Exelon filed a Form 8-K reporting 2001 earnings per share of $4.43, seven cents (1.5%) lower than Exelon's original target of $4.50. Exelon reported that Generation "came in ahead of budget" and that Energy Delivery "exceeded expectations." (R. 18-1, Defs.' Exs., Vol 1, Ex. L., Jan. 29, 2002 8-K.)

**B. GAAP Violations**

Plaintiffs further allege that Exelon falsely represented that its financial statements were prepared in accordance with GAAP when Exelon: (1) improperly recorded a $10 million gain on its investment in Corvis during the first quarter of 2001; and (2) failed to timely record an impairment in the value of its investment in Corvis during the first and second quarters of 2001.

Plaintiffs allege that Exelon violated GAAP by adjusting the value of Unicom and PECO's shares of Corvis stock to $26.00 upon their transfer to Enterprises in February 2001. Plaintiffs contend that Enterprises should have recorded the transferred shares at historical cost because GAAP provides that transfers between companies under common control should not be revalued but recorded by the acquiring entity at the historical cost of the acquiree. Exelon, PECO, ComEd and Enterprises were under common control for accounting purposes, allege Plaintiffs, and thus adjusting the value of the Corvis shares resulting in a $10 million gain violated GAAP and inflated Exelon's net income during the first quarter of 2001.

Plaintiffs also allege that Exelon failed to timely record an impairment in the value of Corvis during the first or second quarter of 2001. Specifically, they allege that the decline in Corvis shares during the first half of 2001 was other than temporary and that the investment should have been written down to fair value in the first or second quarter of 2001. Upon the transfer of Corvis shares to Exelon in February 2001, shares traded at $26.00 per share, but declined to $7.00 by the end of March 2001 and traded as low as $3.00 per share in June 2001. Exelon recorded a $36 million charge related to an impairment in the value of its investment in Corvis in the third quarter of 2001.

Finally, Plaintiffs assert that Exelon failed to timely record impaired goodwill related to

Enterprises. Plaintiffs allege that the value of Enterprises was impaired as early as June 30, 2001, but that Exelon failed to record a loss on the impairment in the carrying value of its reported goodwill until the first quarter of 2002. At that point, Exelon reported a charge of $243 million for impairment of goodwill related to Enterprises.

## LEGAL STANDARDS

Defendants' motion to dismiss implicates Federal Rules of Civil Procedure 12(b)(6) and 9(b) as well as the PSLRA. When considering a motion to dismiss under Rule 12(b)(6), this Court views all facts alleged in the complaint, as well as any inferences reasonably drawn from those facts, in the light most favorable to the plaintiff. *Autry v. N.W. Premium Servs., Inc.* 144 F.3d 1037, 1039 (7th Cir. 1998). The Court may also review any documents referred to in the complaint. *See Albany Bank & Trust Co. v. Exxon Mobil Corp.*, 310 F.3d 969, 971 (7th Cir. 2002). We will grant a motion to dismiss under Rule 12(b)(6) only if it appears beyond doubt that the plaintiff can prove no set of facts entitling him to relief. *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 432 (7th Cir. 1993).

The heightened pleading requirements of Rule 9(b) further require plaintiffs to plead the "circumstances constituting fraud" with particularity. Fed. R. Civ. P. 9(b). In other words, the who, what, when, where and how of the alleged fraud must be plead in detail. *See DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). In addition to the requirements of Rule 9(b), the PSLRA amendments to the Exchange Act raise the pleading standard in securities cases even higher by requiring plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The PSLRA also requires plaintiffs to "specify each statement alleged to have been misleading [along with] the

reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). Mindful of these standards, we turn to Defendants' arguments for dismissal of Plaintiffs' claims.

## ANALYSIS

Defendants move to dismiss Plaintiffs' complaint for failure to state a securities fraud claim under the heightened pleading requirements of Rule 9(b) and the PSLRA. Specifically, Defendants argue that Plaintiffs' claims premised on statements that Exelon would meet its EPS target of $4.50 fail because: (1) the statements were not materially misleading where Exelon reported an actual EPS of $4.43 in 2001; (2) Plaintiffs fail to plead scienter under the PSLRA; (3) Plaintiffs' claims are barred by the regulatory safe harbor, 17 C.F.R. § 240.3b-6; and (4) Plaintiffs' claims are barred by the statutory safe harbor for forward-looking statements, 15 U.S.C. § 78u-5(c)(1). Defendants further argue that Plaintiffs' allegations do not adequately allege any violation of GAAP, and even if they do, Plaintiffs fail to plead facts supporting a strong inference of scienter. Finally, Defendants argue that Plaintiffs' claims against Rowe, McNeill and Gillis fail because Plaintiffs employ group pleading in their amended complaint. The § 20(a) claims in particular fail, argue Defendants, because Plaintiffs have not alleged facts constituting control as to each defendant and act and because their primary causes of action under § 10 and Rule 10b-5 fail.

## I. 2001 Earnings Projections

### A. Materiality

Defendants initially argue that the earnings projection of $4.50 was not materially misleading because actual results only differed from the projection by 1.5%. *See In re Syntex Corp. Secs. Litig.*, 855 F. Supp. 1086, 1096 (N.D. Cal. 1994) (concluding that press releases

stating the company expected "increased sales" in fourth quarter not actionable because the projection was off by less than 2%); *Wenger v. Lumisys*, 2 F. Supp. 2d 1231, 1248-49 (N.D. Cal. 1998) (dismissing claims based on projected earnings as immaterial where projected EPS was $.55 and actual EPS was $.50 and where plaintiff did not plead any facts tending to show that the projections lacked a reasonable basis or were not issued in good faith). Plaintiffs, in turn, argue that it is irrelevant that the actual EPS was close to the projection because the Seventh Circuit mandates that we apply an *ex ante* perspective to securities cases. *See Pommer v. Medtest Corp.*, 961 F.2d 620, 623 (7th Cir. 1992) (holding that false statement to investor that company had patent at time of sale was material even though company subsequently obtained patent within two years of sale).

We agree that we should apply an *ex ante* perspective, that is examine whether Defendants' statements regarding Exelon's ability to meet its target EPS were materially false when made. *See Pommer*, 961 F.2d at 623. Nevertheless, we note that in *Pommer*, the alleged statement was a clear falsehood, a statement that the company had a patent when it did not, even though one was eventually obtained. In this case, the statements regarding the EPS target are projections, by their nature imprecise, and the inquiry is not of the clear-cut type in *Pommer* (was the statement false when made?), but a more subtle inquiry (did the statements lack a reasonable basis when made?). Furthermore, it is noteworthy that the actual EPS in the instant case differed from the projection by only 1.5%, significantly less than the 9% difference found immaterial in *Wenger*. *Wenger*, 2 F. Supp. 2d at 1248-49. Thus, while avoiding an *ex ante* analysis, we nevertheless observe that the fact the projection was only slightly off-mark cannot help but detract from Plaintiffs' argument that the projections were not reasonable when made. We

decline, however, Defendants' invitation to dismiss Plaintiffs' EPS-related claims based on the immateriality of the 1.5% difference, especially given that Defendants have not produced, and the Court has not noted, any binding cases that dismiss claims based on projections that only slightly differ from actual results.

## B. Safe Harbors[5]

### 1. Statutory Safe Harbor

In the PSLRA, Congress, borrowing from the judicially-created "bespeaks caution" doctrine,[6] created a safe harbor for forward-looking statements. The safe harbor applies to written or oral forward-looking statements if: (1) "the statement is identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement," or if the statement is immaterial; or (2) if the plaintiffs fails to prove that the statement was made with actual knowledge that it was false or misleading. 15 U.S.C. § 78u-5(c)(1)(A)-(B). Defendants argue that both subsections of the safe harbor apply to Defendants' statements. In response, Plaintiffs contend that not all of the alleged misstatements are forward-

---

[5] Defendants contend that the safe harbors of SEC Rule 3b-6, 17 C.F.R. § 240.3b-6, and the PSLRA, 15 U.S.C. § 78u-5(c)(1), along with the bespeaks caution doctrine apply to their statements. Although some of the considerations in applying the safe harbors overlap, the Court focuses on the most recent incarnation of the safe harbor in the PSLRA.

[6] The "bespeaks caution" doctrine provides that "when forecasts, opinions, or projections in a disclosure statement are accompanied by meaningful warnings and cautionary language, the forward-looking statements may not be misleading. The substantial disclosure of specific risks may render alleged misrepresentations concerning soft information immaterial and thus nonactionable as securities fraud." *Harden v. Raffensperger, Hughes & Co., Inc.*, 65 F.3d 1392, 1404 (7th Cir. 1995) (citing 3B Harold S. Bloomenthal, *Securities and Federal Corporate Law* § 8.26 [1] at 8-110 (1995)).

14

looking statements, that any warnings were generic and not meaningful cautionary statements and that Defendants had actual knowledge that their statements were false or misleading.

### i. 15 U.S.C. § 78u-5(c)(1)(A): Meaningful Cautionary Statements

As a preliminary matter, Defendants' statements during the class period in press releases, SEC filings and interviews regarding Exelon's ability to meet its 2001 EPS target squarely fall into the PSLRA's definition of forward-looking statements.[7] 15 U.S.C. § 78u-5(i)(1)(A) (statements containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share are forward-looking statements). Thus, the statements fall under the first prong of the safe harbor if they were either accompanied by meaningful cautionary language or if they were immaterial. Language is meaningful and cautionary if it puts an investor "on notice of the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward." *Harris v. Ivax Corp.*, 182 F.3d 799, 807 (11th Cir. 1999) (affirming dismissal under PSLRA's safe harbor where forward-looking statements were accompanied by warnings that informed the reader in detail about kind of misfortunes that could befall the company and their effects). A company, however, need not list all factors that might

---

[7] In their response brief, Plaintiffs identify four statements by Defendants that they argue do not fall within the parameters of the safe harbor. (R. 27, Pls.' Resp. at 31-32.) We agree that statements that Exelon's financial statements were prepared in accordance with GAAP are not forward-looking statements subject to the safe harbor. *See infra* section II. Two of the remaining three statements are also not forward-looking, but do not warrant extensive discussion; Plaintiffs fail to plead with any particularity why the statements related to Enterprises' business plan and the adjustments in the Forms 10-Q were false when made. The fourth statement that Exelon's low cost generation base made the company less vulnerable to an economic slowdown is a forward-looking statement. *See Harris v. Ivax*, 182 F.3d 799, 805 (11th Cir. 1999) (a forward-looking statement is one whose truth can only be discerned after it is made). It is, however, the type of loose optimistic forecast that is not actionable under the securities laws. *See Searls v. Glasser*, 64 F.3d 1061, 1066-67 (7th Cir. 1995).

affect results. *Helwig v. Vencor, Inc.*, 251 F.3d 540, 558-59 (6th Cir. 2001) (citing H.R. Conf. R. No. 104-369, at 43 (1995), U.S. Code Cong. & Admin. News at 742). In fact, the language need not explicitly refer to the risk that ultimately caused the projection to differ from the actual results; it is sufficient that the language warned of risks "of a significance similar to that actually realized." *Ivax*, 182 F.3d at 807. The warnings, however, must be more than boilerplate and should "convey substantive information about factors that could cause results to differ materially from those projected in the forward-looking statements, such as, for example, information about the issuer's business." *Helwig*, 251 F.3d at 558-59. It is not sufficient that a statement warn of general risks applicable to any business (*e.g.* the state of the economy); rather, the risks should be specifically tailored to the company's business. *See In re Champion Enters., Inc. Secs.*, 144 F. Supp. 2d 848, 859 (E.D. Mich. 2001).

The PSLRA provides that cautionary language should accompany a forward-looking statement. 15 U.S.C. § 78u-5(c)(1)(A). Although the Seventh Circuit has not ruled that accompanying cautionary language must be contained in the same document as the forward-looking statement, at least one district court has held that it must. *See In re Apple Computer, Inc., Secs. Litig.*, 243 F. Supp. 2d 1012, 1025 (N.D. Cal. 2002). The Tenth Circuit, however, in discussing the analogous bespeaks caution doctrine, held that cautionary language need not be contained in the same document as the projection, although remote language is likely less effective. *See Grossman v. Novell, Inc.*, 120 F.3d 1112, 1122-23 (10th Cir. 1997). The *Grossman* court reasoned that it is the total mix of information available to investors at the time of the alleged fraudulent statements that is relevant, not whether the warnings were contained in the same document. *Id.* At least one district court following *Grossman*'s ruling in the context of

the PSLRA's safe harbor has considered cautionary language outside the statement at issue. *See In re SI Corp. Secs. Litig.*, 173 F. Supp. 2d 1334, 1356-57 (N.D. Ga. 2001) (holding forward-looking statements in press releases and public statements protected by the PSLRA's safe harbor and the bespeaks caution doctrine where SEC registration statement contained detailed cautionary language). We concur with the reasoning in *Grossman* and thus consider cautionary language not only in the documents containing the forward-looking statements at issue, but also in Exelon's filings with the SEC.[8]

In addition, the documents containing the projections at issue specifically reference other factors listed in Exelon's filings with the SEC. (*See* R. 18-1, Defs.' Exs., Vol. 1, Ex. E, Apr. 24, 2001 8-K at 3; *Id.*, Ex. G, First Quarter 10-Q at 2; *Id.*, Ex. M, June 13, 2001 8-K at 1; *Id.*, Ex. I, July 25, 2001 8-K at 3; *Id.*, Ex. J, Second Quarter 10-Q at 2.) Such direct incorporation of SEC filings by reference is permissible and further supports considering the warnings contained in Exelon's SEC filings. *See In re Humphrey Hospitality Trust, Inc. Secs.*, 219 F. Supp. 2d 675, 684 (D. Md. 2002) (holding that cautionary statements in SEC filings incorporated by reference are adequate to invoke the PSLRA's safe harbor); *In re Champion Enters.*, 144 F. Supp. 2d at 859 (discussing the PSLRA's safe harbor and noting that "cautionary language may be found either within the statement itself or in a readily available document that is incorporated by reference").

Of particular interest to the Court is Exelon's March 2001 Form 8-K, filed with the SEC

---

[8] The Court may consider Exelon's SEC filings in a motion to dismiss without converting the motion to one for summary judgment. *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1276-81 (11th Cir. 1999). In addition, many of Exelon's SEC filing are referred to in Plaintiffs' complaint and thus may be considered in the instant motion to dismiss. *Albany Bank*, 310 F.3d at 971.

before the forward-looking statements at issue were made. Exhibit 99-2 to the Form 8-K explicitly warned of many factors that could affect Exelon's financial results. (*Id.*, Ex. D., Mar. 16, 2001 8-K, Ex. 99-2 at 1-18.) In particular, in the "Outlook" section of Exhibit 99-2 Exelon identified a host of factors that could impact the company's business, including: (1) the development of regulatory restructuring initiatives, inconsistent state regulations and the potential passage of national legislation to address restructuring initiatives, (*id.* at 12); (2) new uncertainties accompanying competition for electric generation services such as "future prices of generation services in both the wholesale and retail markets, supply and demand volatility, and changes in customer profiles," (*id.*); (3) weather, especially temperature variations during summer months, (*id.* at 17); (4) inflation's effects on costs that might not be passed down to customers because of rate caps, (*id.*); and (5) the cost of complying with environmental laws, (*id.* at 17-18).

With respect to Generation, Exelon cautioned that "future results of operations are dependent upon its ability to operate its generating facilities efficiently to meet its contractual commitments and to sell energy services in the wholesale markets." (*Id.* at 16.) The statement further warned that if Generation failed to operate its nuclear generating facilities at capacity, Generation would be forced to deal in the more expensive spot market. In addition, any regulations by the Nuclear Regulatory Commission could also adversely affect Generation's performance. Next, the statement discussed the power marketing activity of Generation's Power Team, which, Exelon warned, was "dependent upon continued development of the wholesale energy market and Power Team's ability to manage trading and credit risks in those markets." (*Id.*) Exelon also warned that because Generation uses contracts for the forward sale and

18

purchase of energy, increased operating costs and depressed prices in the wholesale market would adversely affect Generation's operation. Generation's participation in volatile spot markets, Exelon cautioned, also involved credit risks that Generation might not be able to manage or hedge.

With respect to Enterprises, Exelon warned that EIS and Exelon Services were dependent on the continued growth of the communications, cable and internet industries and that Enterprises' investments were weighted toward the communications industry. The sale, write down, or write off of investments, Exelon disclosed, might increase the volatility of earnings. In short, the "Outlook" section on the March 16, 2001 Form 8-K, released the month before the first allegedly false statement, contained detailed language that cautioned investors as to factors that could negatively impact Exelon's financial results. Although a company need not list all factors that might affect results, Exelon's disclosure nevertheless was exhaustive. *Helwig*, 251 F.3d at 558-59.

In addition to the cautionary language contained in the March 14, 2001 Form 8-K and incorporated by reference, each statement also contained additional language warning investors of risks that could affect earnings results. First, in the April 24, 2001 press release reaffirming the earnings target, also filed as a Form 8-K and clearly identified as a forward-looking statement, Exelon warned of factors that could affect actual results, including "future events affecting the demand for, and the supply of, energy, including weather and economic conditions and the availability of generating units, and other factors discussed in Exelon's filings with the SEC." (R. 18-1, Defs.' Exs., Vol. 1, Ex. E, Apr. 24, 2001 8-K.) Plaintiffs' claims involving declining energy prices and falling rates stem from the very supply and demand issues

19

flagged in the albeit generic language of the April 24, 2001 press release. That language, however, together with the detailed disclosure in the March 14, 2001 Form 8-K, sufficiently warned investors of risks that might affect Exelon's business such that the safe harbor of 15 U.S.C. § 78u-5(c)(1)(A)(i) protects the April 24, 2001 statement.

Plaintiffs also claim that in the first quarter Form 10-Q Defendants failed to disclose and misrepresented risks that made the earnings projection unattainable. (*See* R. 14, Am. Compl. ¶¶ 67-68.) The Form 10-Q, however, also contained sufficient cautionary language. It flagged the market risks related to changes in commodity prices and interest rates and explained Exelon's use of derivative instruments to manage the risks along with the dangers related to using derivative instruments. (R. 18-1, Defs.' Exs., Vol. 1, Ex. G, First Quarter 10-Q at 44-45.) While the language also noted steps taken to minimize risk, the language nevertheless identified the risks to a reasonable investor. Further cautioning investors, the Form 10-Q also incorporated by reference risk factors discussed in other filings with the SEC, which includes the long list of factors detailed in the March 14, 2001 Form 8-K. (*Id.* at 2.) Therefore, Defendants' reaffirmation of Exelon's earnings projection in the first quarter Form 10-Q falls within the first prong of the PSLRA's safe harbor.[9]

Next, Plaintiffs challenge the statements by Rowe in a June 13, 2001 conference, repeated

---

[9] Similarly, Rowe's statement in the May 31, 2001 Wall Street interview contained cautionary language by reference. The statement noted that the interview included forward-looking statements and that risk factors are often included in the company's SEC filings. (R. 18-1, Defs.' Exs., Vol. 1, Ex. N, WST Interview at 1.) In addition, Rowe conceded that all utilities companies are affected by an economic slowdown, but that Exelon monitored economic conditions closely and was less affected by a slowdown because of its low-cost generation base. Together, Rowe's qualified warning along with the warnings in the March 14, 2001 Form 8-K were sufficient to advise a reasonable investor of risks that might affect results.

in a press release filed as a Form 8-K, that Exelon was on track to meet or beat its EPS target. The June 13, 2001 Form 8-K identified statements in the press release and presentation made by Rowe at the conference as forward-looking statements and cautioned in language very similar to that in the April 24, 2001 Form 8-K: "The following factors, among others, could cause actual results to differ materially, and include future events affecting the demand for, and the supply of, energy, including weather and economic conditions and the availability of generating units." (*Id.*, Ex. M, June 13, 2001 Form 8-K.) The Form also referred to factors discussed in the company's other SEC filings. Again, the language in the statement, although bordering on generic, was more than a general warning regarding poor economic conditions, but contained warnings of factors that could significantly affect Exelon's earnings. *See In re Champion Enters.*, 144 F. Supp. 2d at 859. Together with the detailed cautionary language in the March 14, 2001 filing, the language was sufficiently cautionary to invoke the statutory safe harbor.

Similar cautionary language and reference to other SEC filings in the July 24, 2001 Form 8-K and press release also shields Defendants' EPS-related forward-looking statements in those documents. (*Id.*, Ex. I. July 25, 2001 8-K.) In addition, the release flagged several factors that might affect earnings, including "challenges in the wholesale power markets and in our Enterprise group," specifically noting "lower margins in the infrastructure services business [during the second quarter], which has been impacted by the significant downturn in the telecommunications industry." (*Id.* at 2-3.) This cautionary language picked up on warnings in the March 14, 2001 Form 8-K and provided investors with detailed information as to the factors that might affect Exelon's business.

Finally, Plaintiffs challenge Defendants' assurances in the August 14, 2001 Form 10-Q

that Exelon would meet its 2001 EPS target. The Form contained a paragraph identifying statements in the filing as forward-looking and warned that factors including "those discussed herein as well as those listed in Note 7 of Notes to Condensed Consolidated Financial Statements, those discussed in "Management's Discussion and Analysis of Financial Condition and Results of Operation–Outlook" in Exelon Corporation's 2000 Annual Report, and other factors discussed in filings with the Securities and Exchange Commission" could affect results. (*Id.*, Ex. J, Second Quarter 10-Q.) In this case, Exelon's March 14, 2001 Form 8-K, incorporated by reference, provided language that sufficiently warned investors of risks. *See supra* discussion of March 14, 2001 Form 8-K. In addition, the second quarter Form 10-Q contained the same cautionary language relating to market risks and the use of derivative instruments that we found meaningful in the first quarter Form 10-Q. Furthermore, the Form 10-Q specifically refers to factors in Note 7 of the Notes to Condensed Consolidated Financial Statements that could affect earnings. Note 7 includes disclosures regarding environmental liabilities because of site contamination ($168 million accrued as of the end of the second quarter with other costs unknown), Exelon's energy commitments and various suits pending against Exelon, ComEd and PECO. (*Id.* at 23-26.) In short, the second quarter Form 10-Q disclosed multiple risks that could affect Exelon's earnings such that application of the PSLRA's safe harbor is appropriate.[10]

---

[10] Plaintiffs also challenge Rowe's statement to *Crain's Chicago Business*, published on August 27, 2001 that Enterprises' EBIT would be zero to negative. Plaintiffs contend that Rowe had no reasonable basis to represent that Enterprises might achieve "zero" EBIT in 2001 because EBIT in the first half of 2001 were negative $36 million. Rowe, however, stated a range of possible EBIT in a gloomy article, entitled "Exelon halts campaign to diversify; won't expand, may sell unregulated businesses," that revealed that Exelon would invest little or nothing in Enterprises in 2002. The projection was clearly negative and simply because Rowe offered a range of projected EBIT does not make the statement misleading. To label the statement as fraudulent is simply a stretch.

### ii. 15 U.S.C. § 78u-5(c)(1)(B): Actual Knowledge of Misleading or False Nature

Even assuming *arguendo* that the alleged fraudulent statements were not accompanied by meaningful cautionary language, Plaintiffs' EPS-related claims nevertheless fail because Plaintiffs do not plead facts that show a strong inference that Defendants actually knew that their EPS-related forward-looking statements were false or misleading. Although allegations of recklessness plead with particularity survive a motion to dismiss in the case of statements of present or historical fact, the PSLRA provides a safe harbor for forward-looking statements if a plaintiff fails to plead with particularity that a defendant made the statement with *actual knowledge* that it was false or misleading. See 15 U.S.C. § 78u-5(c)(1)(B); 15 U.S.C. § 78u-4(b)(2); *Helwig*, 251 F.3d at 551. Thus, to survive the motion to dismiss their forward-looking EPS-related claims, Plaintiffs must plead with particularity facts that strongly imply that Defendants actually knew that the projections were false or misleading when they made them. Although there is great debate among the Circuit Courts as to what types of facts—those showing motive and opportunity to commit fraud and/or those establishing strong circumstantial evidence of conscious behavior or recklessness— adequately plead scienter, this Court has previously held and repeats that the type of facts plead is immaterial so long as they support a strong inference that the defendant acted knowingly. *Chu v. Sabratek Corp.*, 100 F. Supp. 2d 815, 823 (N.D. Ill. 2000) ("*Chu I*"); *Helwig*, 251 F.3d at 551-52 (holding that "[b]ecause Congress did not endorse or prohibit a particular manner of pleading, we cannot disregard any set of facts as insufficient as a matter of law"); *Fishman v. Meinen*, No. 02 C 3433, 2003 WL 444223, at *5 (N.D. Ill. Feb. 24, 2003) (collecting cases in the Northern District of Illinois that allow a plaintiff to plead scienter

with allegations of motive and opportunity or circumstantial evidence).

Plaintiffs vacillate between alleging that Defendants knew of the falsity of their statements and that they recklessly disregarded factors that could affect results. (*See, e.g.*, R. 14, Am. Compl. ¶ 62 ("[b]ecause of these and other factors discussed below, defendants knew, or recklessly disregarded, that Exelon was incapable of generating EPS of $4.50 in 2001); R. 27, Pls.' Resp. at 18, ("plaintiffs allege that while reassuring the market that EPS of $4.50 were attainable, defendants knew" that factors made the target unattainable.)) One court in this district has held that pleading knowledge along with recklessness in the alternative dooms allegations related to forward-looking statements because the standard is actual knowledge. *See Clark v. TRO Learning, Inc.*, No. 97 C 8683, 1998 WL 292382, at *5 (N.D. Ill. May 20, 1998). However, rather than dismissing Plaintiffs' allegations outright for failure to plead the appropriate standard, the Court will examine the evidence of motive and opportunity and circumstantial evidence Plaintiffs offer to plead scienter.

First, Plaintiffs' allegations of motive and opportunity are not of the type that give rise to a strong inference of actual knowledge of falsity. Plaintiffs allege that because of their high-level positions Rowe, McNeill and Gillis had the opportunity to commit fraud and were motivated so that Exelon and Generation's debt offerings might be consummated on better terms and their compensation packages increased. As we have previously concluded, maximizing both earning potential on corporate debt offerings and executive compensation are "the goals of all corporate executives; as such, they do not even remotely suggest fraudulent motivation." *Chu v. Sabratek Corp.*, 100 F. Supp. 2d 827, 841 (N.D. Ill. 2000) (citations omitted) ("*Chu II*"); *See also San Leandro Emergency Med. Group Profit Sharing Plan v. Phillip Morris Cos., Inc.*, 75 F.3d 801,

24

814 (2d Cir. 1996) (opining that a company's desire to maintain a high bond or credit rating does not qualify as a sufficient motivation for fraud); *Acito v. IMCERA Group Inc.*, 47 F.3d 47, 54 (2d Cir. 1994) (rejecting plaintiff's allegation that defendants were motivated to defraud the public because an inflated stock price would increase their compensation because "[i]f scienter could be pleaded on that basis alone, virtually every company in the United States . . . could be forced to defend securities fraud actions). Therefore, Plaintiffs' allegations of motive and opportunity do not give rise to a strong inference of scienter.

Plaintiffs, however, contend that the bulk of their scienter allegations fall into the second category of strong circumstantial evidence of scienter. Plaintiffs maintain that they adequately plead circumstantial evidence with their allegations that Defendants failed to disclose that "adverse market conditions, economic weakness, declining energy prices and undisclosed company specific information evidencing the collapse of Exelon's Enterprises business segment" made the $4.50 EPS target unattainable. (R. 27, Pls.' Mem. at 18-21.) Defendants, in turn, maintain that Plaintiffs fail to allege with particularity facts that indicate that Defendants knew the projections would not be met. Plaintiffs, they argue, essentially plead fraud by hindsight.

We agree that Plaintiffs' allegations that Defendants knew the projections would not be met are conclusory and insufficient to plead actual knowledge. Plaintiffs essentially assert that Defendants must have known that the EPS target would not be met because of challenges at Enterprises due to the decline of the telecommunications industry and because of the negative effects of cool weather and lower energy prices on Generation, which held long-term power contracts. A large portion of Plaintiffs' allegations describe challenges faced by Enterprises, labeled as a *long-term* money earner from the time of the merger. It was never expected,

however, that Enterprises would contribute significantly to earnings in 2001. In fact, Enterprises was expected to report a $15 million loss in 2001; EBIT were projected at $60 million, contributing only 1.7% of Exelon's projected earnings. In contrast, Delivery, to which Plaintiffs address few if any particularized allegations, was projected to earn $2,460,000 million, contributing 70% of Exelon's earnings in 2001; Generation was expected to contribute 28% of 2001 earnings. Thus, Plaintiffs' detailed allegations regarding the problems at Enterprises do not adequately plead knowledge of falsity because Enterprises was never expected to contribute significantly to earnings in 2001.

Plaintiffs add allegations of adverse market conditions, economic weakness and declining energy prices to make their case for actual knowledge. Nevertheless, Exelon as a whole performed well during the first half of 2001, chipping away at Plaintiffs' argument that Defendants knew the projections would not be met. For example, Exelon reported earnings per share of $1.23 in the first quarter of 2001, 27% of the $4.50 projection and within the quarterly distribution of 20-30%. (R. 18-1, Defs.' Exs., Vol. 1, Ex. E, Apr. 24, 2001 8-K.) Second quarter earnings, despite the challenges catalogued by Plaintiffs, slightly exceeded the company's projection for that quarter, reported at $.97 per diluted share. (*Id.*, Ex. I, July 24, 2001 8-K.) Thus, we cannot infer from these facts that Defendants actually knew that the projection would not be met. Third quarter results were disappointing for Exelon due to a constellation of factors that the company warned could affect results, including cooler weather and the accompanying decline in energy prices, which the company disclosed in the September 27, 2001 press release. Nevertheless, given the strong performance of the core business of Generation and Delivery throughout 2001 despite these challenges, we conclude that Plaintiffs do not plead facts sufficient

to imply actual knowledge of falsity of the projection. *See In re Hall, Kinion & Assocs., Inc.,*

*Secs. Litig.*, No. C 99-02943 WHA, 2000 WL 1639503, at *2 (N.D. Cal. Oct. 27, 2000)

(dismissing complaint for failure to plead scienter;"[a]ctual knowledge of falsity could be shown

only if the internal circumstances were so gloomy that it was unlikely that managers in the shoes

of defendants could have reasonably believed the external projections").

The Court acknowledges that although it is not necessary for Plaintiffs to plead a

"smoking gun," they must plead with particularity facts that imply that a defendant knew that the

projection was false. For example, a plaintiff might present circumstantial evidence that a

defendant received a contemporaneous report that contradicted an alleged misrepresentation or

that a witness informed a defendant of the falsity of the statement before it was made. *See In re*

*Northpoint Communications Group, Inc., Secs. Litig.*, 184 F. Supp. 2d 991, 997-98 (N.D. Cal.

2001). Or, as in one of the cases cited by Plaintiffs, a plaintiff's allegations of insider trading can

raise an inference of actual knowledge. *See In re Sensormatic Elecs. Corp. Secs. Litig.*, No.

018346, 2002 WL 1352427, at *6-7 (S.D. Fla. June 10, 2002) (holding that "out of line" insider

trading supported a strong inference of scienter where sales were made after meeting disclosing

adverse sales trends but before public announcement of trends and subsequent stock drop). A

plaintiff might also plead that key officers knew of facts critical to a business's core operations or

to an important transaction that would affect a company's performance. *Id. See also*

*Manavazian v. Atec Group, Inc.*, 160 F. Supp. 2d 468, 484-85 (E.D.N.Y. 2001) (denying motion

to dismiss where plaintiffs alleged that defendants knew that the company's core business had

materially shrunk and that defendants engaged in unusual insider trading); *In re Peoplesoft Inc.*

*Secs. Litig.*, 2000 WL 1737936, at *2-3 (N.D. Cal. May 25, 2000) (holding that complaint

adequately alleged scienter where flagship software products were laced with an abnormally large number of defects and major customers threatened to sue over defects, management was on notice that quotas and budgets could not be met and insider trading occurred). In short, the instant complaint, which largely focuses on problems at Enterprises, Exelon's smallest segment that was projected to contribute less than 2% of earnings in 2001, lacks the type or combination of allegations that give rise to a strong inference of actual knowledge of falsity. Rather, the allegations show that Defendants had a reasonable basis for reaffirming Exelon's earnings projection.[11] As such, the second prong of the PSLRA's safe harbor applies because Plaintiffs fail to allege facts that strongly imply that the statements reaffirming the earnings projections were made with actual knowledge that the statements were false or misleading.

## II. Alleged GAAP Violations

As further evidence of scienter, Plaintiffs also claim that Defendants violated GAAP by: (1) recording a $10 million gain on its investments in Corvis during the first quarter of 2001; (2) failing to record an impairment in the value of its investment in Corvis during the first or second quarters of 2001; and (3) failing to record a loss due to an impairment in the carrying value of its reported goodwill during the first half of 2001. Defendants argue that these facts do not allege GAAP violations or support a strong inference of scienter. We agree that Plaintiffs' GAAP allegations do not support a strong inference of scienter.

As we noted in *Chu II*, allegations of GAAP violations, standing alone, are insufficient to raise an inference of scienter. *Chu II*, 100 F. Supp. 2d at 838. Rather, a plaintiff must also plead

---

[11] In addition, because the statements reaffirming Exelon's projections had a reasonable basis in fact, the regulatory safe harbor of SEC Rule 3b-6 also immunizes these statements. 17 C.F.R. § 240.3b-6. *See Arazie v. Mullane*, 2 F.3d 1456 (7th Cir. 1993).

facts that support an inference that a defendant acted with reckless disregard or gross indifference to alleged misrepresentations in financial statements. *Id.* Facts that might support such an inference include those detailing the magnitude of the accounting error, a defendant's prior notice of the error or a defendant's responsibility for calculating and disseminating financial information. *Id.*

Two of Plaintiffs' alleged GAAP violations relate to Exelon's reporting on its investment in Corvis. Exelon, Plaintiffs argue, should not have recorded a $10 million gain in Corvis during the first quarter of 2001 and should have recorded an impairment in the value of Corvis during the first or second quarters of 2001 rather than the third quarter. With respect to the first quarter $10 million gain, the parties dispute whether Exelon properly recorded the gain. Plaintiffs assert that the Corvis shares were transferred among entities under common control and thus should not have been revalued; Defendants maintain that the shares were distributed from an investment limited partnership under the cost method of accounting, which allowed Exelon to revalue the shares to the extent their current value exceeded their cost. Plaintiffs' allegations regarding the gain, however, do not necessitate that we delve into the maze of GAAP.

Assuming *arguendo* that the decision to record the $10 million gain was a violation of GAAP, this fact does not support a strong inference scienter. Plaintiffs must allege that Defendants made this error with reckless disregard or gross difference, which in this case is not shown by the relatively insignificant error. *Id.* Plaintiffs allege that the gain inflated Exelon's net income for the first quarter; net income was reported at $399, inflated by the Corvis gain by less than 3%, which does not raise a strong inference of scienter. *See Greebel v. FTP Software, Inc.*, 194 F.3d 185, 206 (1st Cir. 1999) (concluding that improperly recorded revenue that raised

29

overall revenue by up to 4% did not support a strong inference of scienter); *In re Allscripts, Inc. Secs. Litig.*, No. 00 C 6796, 2001 WL 743411, at *10-11 (N.D. Ill. June 29, 2001) (same). *Cf. Chalverus v. Pegasystems, Inc.*, 59 F. Supp. 2d 226, 228-29 (D. Mass. 1999) (denying motion to dismiss where GAAP violation alleged improper reporting of $5 million in software license revenue where overall software license revenue was $9 million).

Plaintiffs' allegation that Exelon failed to timely record an impairment in the value of Corvis also does not support an inference of scienter. Although Exelon wrote down the investment in the third quarter of 2001, Plaintiffs contend that the impairment should have been recorded in the first or second quarter of 2001. The impairment, Plaintiffs argue, should have been recognizable to Exelon as "other-than-temporary" under GAAP during the first half of 2001. The fact remains, however, that Defendants did write down the investment in Corvis in the third quarter and thus the parties only dispute when the write down should have occurred. In an analogous context, the Seventh Circuit held that this type of timing dispute does not adequately plead fraud. *See DiLeo v. Ernst & Young*, 901 F.2d 624, 626 (7th Cir. 1990). In *DiLeo*, plaintiffs alleged that defendant accounting company certified fraudulent financial statements that understated losses from bad loans by about $4 billion. In affirming the dismissal of the complaint for failure to plead fraud with particularity, the Seventh Circuit noted that "[i]f all that is involved is a dispute about the timing of the writeoff, based on estimates of the probability that a particular debtor will pay, we do not have fraud; we may not even have negligence." *Id.* Here, the probability was not whether a debtor would pay but rather whether the value of Corvis shares would increase. Despite the falling price of Corvis shares during the first half of 2001, Defendants did not write down their investment in Corvis during the first two

quarters, holding out for a rebound in the share price. Perhaps the delay in reporting the write down was overly-optimistic, but as noted in *DiLeo*, for every write-down, there is always someone who says the company should have acted sooner. In this case, Plaintiffs only assert that the company should have reported the impairment three to six months before it actually did so. Furthermore, as noted by Defendants, even if Exelon had not recorded the $10 million gain and had recorded the $36 million charge, EPS would still have been in the projected target range for the first two quarters of 2001. (R. 20, Defs.' Reply at 18 n.24.) Plaintiffs' GAAP violations allege relatively modest amounts of improperly recorded gains and losses when compared to the hundreds of millions of dollars the company was earning each quarter. In short, the allegations involving Corvis do not raise a strong inference of scienter, as required by the PSLRA.

Finally, Plaintiffs' allegations that Exelon failed to timely record impaired goodwill in the amount of $243 million also fail because they are not plead with particularity and do not give rise to a strong inference of scienter. Plaintiffs allege that the value of Enterprises was impaired as early as June 30, 2001 due to Enterprises' investment in the declining telecommunications industry, including Corvis, but that Exelon waited until March 31, 2002 to report the charge. The allegations, however, largely lack detail as to which businesses or assets were impaired and by how much and why the write down was necessary after the first half of 2001, all necessary elements of pleading fraud with particularity. Rather, the allegations strike the Court as ones of fraud by hindsight; Plaintiffs do not allege any specifics on the amount of write-downs that should have been taken in 2001, but point to the $243 million charge in the first quarter of 2002 and argue that it should have been taken sooner, without allegations to support this contention. Such generalized allegations cannot raise an inference of scienter. *Cf. In re Revlon Secs. Litig.*,

31

No. 99 Civ 10192, 2001 WL 293820, *1 (S.D.N.Y. Mar. 27, 2001) (denying in part motion to dismiss securities fraud action where plaintiffs plead particularized allegations that defendant falsified financial results through the recognition of "revenue" from false sales and the failure to timely write down excess and obsolete inventory and alleged that overstatements of net income were between 22% and 655%).

In short, Plaintiffs' GAAP allegations lack particularity and do not give rise to a strong inference of scienter. In addition, because Plaintiffs fail to plead a primary cause of action under § 10 and Rule 10b-5, Plaintiffs' § 20(a) claims against the individual Defendants as controlling persons also fail. *See Geinko v. Padda*, No. 00 C 5070, 2001 WL 1163728, at *9 (N.D. Ill. Sept. 28, 2001).

## CONCLUSION

In this era of focused attention on issues of corporate fraud and responsibility, the Court has very carefully reviewed Plaintiffs' complaint. Nonetheless, the complaint fails on various grounds. Defendants' earnings projections were accompanied by sufficient cautionary language such that the statements fall under the first prong of the PSLRA's safe harbor. In addition, Plaintiffs fail to plead facts that give rise to a strong inference of scienter as required by the PSLRA—actual knowledge with respect to the forward-looking statements and recklessness with respect to the remaining statements. The Court recognizes that leave to amend should be granted freely, but in this case, any amendment to the instant complaint would be futile. The extensive cautionary language bars any claims based on the projections, and the GAAP violations are essentially timing issues, which the Seventh Circuit suggests cannot constitute fraud. *DiLeo*, 901 F.2d at 626. As such, the Court grants Defendants' motion to dismiss with prejudice.

(R. 17-1.) The Clerk of the Court is instructed to enter a final judgment, pursuant to Federal Rule of Civil Procedure 58, in favor of Defendants.

ENTERED:

Judge Ruben Castillo
United States District Court

Dated: June 12, 2003